UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>HENCO HOLDING CORP., ALFREDO CACERES, LUIS ALFREDO CACERES, LUIS ANGEL CACERES (individually and as beneficiary of the Luis Angel Caceres Charitable Remainder Unitrust), and LUIS ANGEL CACERES CHARITABLE REMAINDER UNITRUST,<br><br>    Defendants. | CIVIL ACTION NO.<br>1:18-CV-03093-CAP |

# O R D E R

This case is about an alleged scheme to evade tax liability through the use of an intermediary transaction tax shelter, known as a 'midco' transaction. Henco Holding Corporation ("Henco") never appeared in this action, so the court granted the government's motion for a default judgment against Henco on October 14, 2018, although no judgment was entered at that time because there are unresolved claims between the government and the other defendants, Alfredo Caceres, Luis Alfredo Caceres, Luis Angel

Caceres, and the Luis Angel Caceres Charitable Remainder Unitrust.[1] This matter is before the court on the defendants' motion to dismiss [Doc. No. 29].

## I. Background

This case centers around the April 10, 1997 sale of Henco to UP Acquisitions, and certain capital gains tax liabilities that arose as a result of that sale. Because the court is ruling on the defendants' motion to dismiss, the following facts are derived from the complaint, assumed to be true, and are viewed in the light most favorable to the government.

At all relevant times prior to April 10, 1997, Alfredo Caceres and his two sons, Luis Alfredo Caceres and Luis Angel Caceres, controlled 100% of Henco's stock [Doc. No. 1 ¶¶ 7–10]. Alfredo Caceres owned 51%, Luis Alfredo Caceres owned 24.5%, Luis Angel Caceres owned 2.45%, and the Luis Angel Caceres Charitable Remainder Trust (of which Luis Angel Caceres was the grantor, trustee, and beneficiary) owned 22.05% of the company [*Id.*]. As of December 1996, Henco's sole asset was a 50.5% interest in Belca Foodservice Corp ("Belca") [*Id.* ¶¶ 20–22]. At some point, Henco began to consider selling

---

[1] For simplicity's sake, the court will collectively refer to the defendants that have appeared—Alfredo Caceres, Luis Alfredo Caceres, Luis Angel Caceres, and the Luis Angel Caceres Charitable Remainder Unitrust—as "the defendants." When referring to Henco Holding Corporation and the Caceres defendants, the court will separately reference "Henco" and "the defendants."

2

its interest in Belca and distributing the proceeds from the sale to the defendants, in their capacity as Henco shareholders [*Id.* ¶ 20].

But if Henco liquidated its Belca stock and directly distributed those proceeds to the defendants, there would be dual taxation on the transaction since (1) Henco would have to pay a capital gains tax on the Belca stock because it appreciated substantially in the time after Henco acquired it; and (2) the defendants would each be taxed on their share of the distribution [*Id.* ¶¶ 22–23]. Because the defendants wanted to avoid paying the capital gains tax they decided to engage in a transaction that—while essentially the liquidation of Henco's assets and the distribution of those proceeds to the defendants—appeared on paper to be the sale of the defendants' Henco stock to a third party [*Id.* ¶¶ 24–25].

The first step in this plan was to sell the Belca stock. And on January 31, 1997, the defendants reached an agreement to sell Henco's Belca interest to an unrelated third party for approximately $37 million in cash [*Id.* ¶¶ 55–56]. Because Belca was Henco's sole asset, after the sale Henco had no other assets apart from the $37 million in cash from the sale [*Id.* ¶ 58]. But the sale simultaneously triggered a capital gains tax liability of approximately $13 million [*Id.*], which left Henco worth approximately $24 million.

Next the defendants and UP Acquisitions, a subsidiary of Skandia Capital Group ("Skandia"), entered into an agreement where UP Acquisitions would purchase all of Henco's stock from the defendants for $33,493,284.00 [*Id.* ¶ 59]. On April 4, 1997, Henco opened a bank account with the Dutch bank Rabobank, and on April 9, 1997, it transferred all its cash—more than $37 million—into that account [*Id.* ¶¶ 60, 63]. The next day, on April 10, 1997, Skandia borrowed $33,493,284.00—the exact amount of the purchase price—from Rabobank, promised Rabobank it would repay the loan by May 9, 1997, and pledged the Henco stock to secure the loan [*Id.* ¶ 64]. That same day UP Acquisitions (1) used the loan from Rabobank to purchase the Henco stock; (2) declared a dividend to itself (as the sole shareholder of Henco) for $34,493,284.00 which it used to repay the Rabobank loan plus interest; and (3) instructed Rabobank to make a pro rata distribution of the sale proceeds—$33,493,284.00—to the defendants [*Id.* ¶ 64].

As a result of that transaction, the defendants received approximately $33,493,284.00 for a company worth roughly $24 million. In return, Skandia paid approximately $34,493,284.00 for a company with over $37 million in its coffers, but with over $13 million in tax liabilities. Henco owed, but never paid, the approximately $13 million capital gains tax because it engaged in a series of transactions, involving European currency options, with other

4

Skandia subsidiaries that were known tax shelters, creating an artificial tax loss to offset the capital gain from the sale of the Belca stock [*Id.* ¶¶ 71–97].

Because Henco is insolvent, the government is attempting to collect Henco's unpaid capital gains tax (as well as some much smaller tax liabilities which arose in the years preceding Henco's sale to UP Acquisitions) from the defendants. That amount, as of May 3, 2018, and inclusive of penalties and interest, is $56,356,718.77 [*Id.* ¶ 115]. To do so, the government has asserted one count of fraudulent transfer under Georgia's former Fraudulent Transfer Act, O.C.G.A. §§ 18-2-21 and 18-2-22 (the "FTA"), as it was in effect at the time of the transfers, against each defendant.[2]

The defendants have moved to dismiss the government's claims against them on two grounds. First they claim that the four-year statute of limitations under Georgia's FTA, as well as the four years allowed under the Tax Code (three years for an assessment or proceeding against the taxpayer under § 6501, plus the one-year extension for transferee liability under

---

[2] O.C.G.A. § 18-2-22 was repealed in 2002 and replaced by O.C.G.A. §§ 8-2-70 through 8-2-85 as part of the enactment of the Uniform Fraudulent Transfers Act. The parties agree that the repealed § 18-2-22 applies to the government's claims because the transfers occurred in 1997 [Doc. No. 29-1 at 5–6].

5

§ 6901) have run.³ They further argue that the Georgia FTA does not allow the government to restructure the above-described transaction to make the defendants "transferees" of Henco for tax purposes. The government claims that a state's statute of limitations does not apply to the United States, and that the ten-year statute of limitations found in 26 U.S.C. § 6502 applies to its claims. The government further argues that Georgia's FTA permits the restructuring of the 'midco' transaction to assert transferee liability against the defendants.

## II.   Legal Standard for a Motion to Dismiss

When ruling on a motion to dismiss, the court presumes that the facts asserted in the plaintiff's filings are true and construes them in the light most favorable to the plaintiff. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) ("At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."). But the court is not required to accept the plaintiff's legal conclusions. *See Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (citing *Ashcroft v. Iqbal*,

---

³ The defendants concede that the Tax Code's statute of limitations was tolled while the government was proceeding against Henco, and that did not expire until May 2012, approximately 15 years after the transaction at issue.

556 U.S. 662, 678 (2009)). Nor will the court accept as true a legal conclusion couched as a factual allegation. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Additionally, a statute of limitations defense succeeds under Rule 12(b)(6) only when it is clear from the face of the complaint that the statute of limitations has run and the plaintiff can prove no set of facts that toll the statute. *See F.D.I.C. v. Cameron*, 986 F. Supp. 2d 1337, 1339–40 (N.D. Ga. 2013).

### III.   Statute of Limitations

The defendants' first statute of limitations argument is that the plaintiff's claims are barred by the 4-year statute of limitations imposed by the Georgia FTA. But the government correctly points out that the United States is not bound by state law statutes of limitations. *United States v. Summerlin*, 310 U.S. 414, 416 (1940) ("It is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights.").

Next, the defendants claim that even if the FTA's limitations period does not apply, the statute of limitations in 26 U.S.C. § 6901—which they contend governs the government's claims—expired in May 2012. The

government concedes that the time to proceed under § 6901 has passed,[4] but claims that that statute of limitations under 26 U.S.C. § 6502(a) has not run, and it may proceed against the defendants under that statute. The defendants respond that the ten-year limitations period contained in § 6502(a) applies only to taxes that were already assessed within three years pursuant to § 6501, and that, while Henco was assessed, no assessment was ever made against the defendants. The government counters this argument by claiming that the timely assessment against Henco is applicable to the defendants because the government does not have to duplicate its efforts and separately assess the same tax against the defendants.

Essentially, the question the court must answer is whether there is any mechanism which would allow the government to proceed against the defendants, in an effort to collect Henco's unpaid taxes, once the time for assessing the defendants has passed.[5] But no one statute in the Tax Code specifically answers this question. The government argues that the Tax Code

---

[4] "It is true, but irrelevant, that the time for making a § 6901 assessment has passed" [Doc No 30 at 19]. Because the government concedes this point, it is irrelevant whether the defendants are considered original transferees (the government's primary theory of liability) or transferees of a transferee (its alternative theory) for this analysis.

[5] The defendants' position is that they are not transferees. But the government has pled that they are, and court will consider them as such for the purposes of its statute of limitations analysis.

8

authorizes it to collect from an unassessed transferee such as the defendants at any point during the ten-year period following its assessment of the transferor, Henco. But the court's reading of the Tax Code does not support this result.

The court will briefly lay out the relevant portions of the three statutes that are integral to this analysis: §§ 6501, 6502, and 6901 of the Tax Code. Section 6501 says the government cannot file a lawsuit to collect from an unassessed taxpayer after the three-year period for making an assessment has passed. Section 6901(a) requires the government to collect taxes from transferees in the same way it collects from taxpayers. Section 6502 sets the general statute of limitations for collecting tax liabilities to within 10 years from the assessment of the tax.

The court will begin its analysis with § 6901, which tells us that a transferee's tax liability "shall . . . be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred." 26 U.S.C. § 6901(a). The court interprets this language to mean that transferee liability is to be assessed, paid, and collected under the same rules that apply to assessing, paying, and collecting the ordinary, pre-transfer tax liability of the transferor. This interpretation is consistent with the intent of Congress

9

that § 6901 was designed "to provide for the enforcement of [transferee] liability . . . by the procedure provided in the [Tax Code] for the enforcement of tax deficiencies." S. Rep. No. 69–52, at 30 (1926). *See also Hulburd v. Comm'r of Internal Revenue*, 296 U.S. 300, 306, (1935) (citing § 280 of the Revenue Act of 1926—the precursor to § 6901—for the proposition that "[i]f some one else was to be charged, there would be need of a new assessment").

It is true that § 6901 does provide exceptions to this general rule that taxes are to be assessed, paid, and collected against transferees in the same manner as those against any other tax payer. *See* 26 U.S.C. § 6901(a). But the only possibly relevant exception is found in § 6901(c)(1), which extends the "period of limitations for assessment of" transferee liability to "within 1 year after the expiration of the period of limitation for assessment against the transferor." But the government acknowledges "that the time for making a § 6901 assessment [against the defendants] has passed" [Doc No 30 at 19]. Therefore, the court must look to the "same provisions and limitations" of the Tax Code that provide for collecting an unassessed tax liability after the time for assessment has expired. 26 U.S.C. § 6901(a).

That provision is § 6501(a), and it does not support the government's position that it may collect unassessed taxes from the defendants at any point within the time where it may collect the assessed taxes against Henco.

10

The rule for collection without assessment is: "[T]he amount of any tax imposed by this title shall be assessed within 3 years . . ., and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period." 26 U.S.C. § 6501(a). Because the government never assessed the transferee defendants, and because the "period" for when the defendant's tax liability "shall be assessed" has passed, the plain language of § 6501(a) does not permit the government to now collect this tax without an assessment.

And requiring the government to assess transferees under § 6901 before collecting is not only consonant with the wording of the statutes, but it is also supported by the legislative history. When the statute was first enacted it provided for a single period of limitation for all transferees—one year after the expiration of the period of limitation for assessment against the taxpayer. Revenue Act of 1926, § 280(b)(1). Two years later, in the Revenue Act of 1928, Congress provided a longer period of limitation for assessment of the liability of a transferee of a transferee. Revenue Act of 1928, § 311(b)(2). As initially passed by the House, the 1928 Act provided that the period of limitation for each succeeding transferee would expire one year after the expiration of the period of limitation for assessment against the preceding transferee. The Senate, however, amended this provision to

11

add the overall limitation that transferee liability may only be assessed within three years after the expiration of the period of limitation for assessment against the taxpayer. This amendment was adopted by the conference committee, embodied in the 1928 Act, and has been the law ever since. Specifically, the Senate Finance Committee explained:

> Section 311(b)(2) of the House bill provides, with specific exceptions, that the period for assessment in such case shall be one year after the expiration of the period of limitation for assessment against the preceding transferee. It seemed to the committee that this would unduly prolong litigation and that there should be a time when the transferee may know that he is no longer liable to be proceeded against. A committee amendment therefore provides that in all cases the tax must be assessed within three years after the expiration of the period of limitation for assessment against the taxpayer.

S. Rep. No. 70-960, at 32 (1928). Clearly Congress did not intend for an assessment against a taxpayer to extend an unassessed transferee's possible liability for ten years or more. An assessment against the transferee must be made, so that "the transferee may know that he is no longer liable to be proceeded against." *Id.*

But the government does not agree with this straight-forward interpretation and application of the Tax Code, or with the cited legislative history. Instead it cites *Hall v. United States*, 403 F.2d 344, 345 (5th Cir.

12

1968),[6] and *United States v. Galletti*, 541 U.S. 114 (2004), for the proposition that once the government has assessed Henco, nothing requires it to duplicate its efforts and reassess the same tax against the defendants.[7] It concludes that "it is beyond dispute that the IRS properly assessed Henco with a tax, so there was no need to separately make a duplicative assessment" [Doc. No 30 at 19]. But the court's reading of *Hall* and *Galletti* does not correspond with the government's.

The court in *Hall* was asked to determine whether the government could seek to collect taxes owed by the Halls from the transferees of the Halls' property. 403 F.2d at 345. The government claimed that the transfer of the

---

[6] *Hall*, like all Fifth Circuit precedent established before October 1, 1981, is binding on this court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[7] The government also cites *United States v. Motosko*, No. 8:12-CV-338-T-35-TGW, 2012 WL 2088739, at *2 (M.D. Fla. Apr. 19, 2012), and *United States v. Matzner*, No. 96-8722-CIV, 1997 WL 382126, at *2 (S.D. Fla. Mar. 26, 1997), for the proposition that the government may bypass an assessment under § 6901 and proceed directly with a lawsuit against the transferees. But those cases stand only for the proposition that the IRS may proceed judicially against a transferee through equitable proceedings in court—as opposed to summary proceedings—just as it can against a transferor. *Motosko*, *id.*; *Matzner*, *id*. But, as *Matzner* explains, neither of those cases address whether the government may do so outside the time allowed under § 6901. *Matzner, id*. (stating that the plaintiff's cited authority "involves a time bar under § 6901, not the Government's right to proceed outside of § 6901 without assessment, and therefore is inapplicable to the instant case"). As such, *Motosko* and *Matzner* are not persuasive authority on this issue.

13

property from the Halls to the transferees was fraudulent and that it was irrelevant that no assessment was made against the transferees or that the time for an assessment was passed. *Id.* The transferees argued that the government could not proceed against them because they had not been timely assessed. *Id.* Ultimately, the Fifth Circuit determined that no additional assessment was necessary because the government had judgments against the taxpayer-transferors (the Halls), and so its suit against the appellant-transferees was ancillary. *Id.* at 347.

At first blush, *Hall* does appear to be on point. But—unlike the case at bar—*Hall* was not an action seeking to impose liability against the transferees themselves.  It was an "in rem action to set aside fraudulent conveyances [of the Halls' property] ancillary to collecting a judgment against taxpayer-transferors." *Id.* at 345. The court, in distinguishing the *Hall* transferee's cited authority, specifically noted that all the transferees' cases were inapplicable because they dealt with "government instituted proceedings against the stockholders of a dissolved corporation to recover taxes due by the corporation." *Id.* And because *Hall* was an in rem action against property, not a proceeding against stockholder/transferees of a dissolved corporation, the court held that "the transferee provisions of the 1954 Code, 26 U.S.C.A. §§ 6901-6903 (assessments against transferees), are

not involved in the cause of action being asserted here." *Id.* But in this case, the government here is seeking to hold the defendants—who are transferee stockholders of a dissolved corporation—personally liable under a transferee theory. It is not proceeding in rem against specific property held by the defendants that formerly belonged to Henco. *Hall*'s holding is inapplicable and does not alter this court's interpretation of transferee liability under the Tax Code.

Likewise, *Galletti* also does not stand for the government's proposition that no reassessment is needed against the transferees because the IRS has properly assessed Henco. In *Galletti* the IRS assessed a partnership—as opposed to a corporation like Henco—for various tax liabilities. *Galletti*, 541 U.S. at 117. When the partnership failed to satisfy the debt, the IRS attempted to collect from the general partners without separately assessing them. *Id.* The partners argued they had to be separately assessed within three years of the partnership's tax return filings, and since the time for assessment had passed, the IRS could no longer collect the liability from them. *Id.* The Supreme Court disagreed, concluding that § 6501(a) does not require the IRS to make "separate assessments of a single tax debt against persons or entities <u>secondarily liable</u> for that debt" because it permits the government to collect from those who are secondarily liable just as it permits

15

the government to collect from those who were primarily liable, so long as the it does so within the ten-year post-assessment collection period provided by § 6502. *Id.* at 121–22. Specifically, the Court held:

> Once a tax has been properly assessed, nothing in the [Tax] Code requires the IRS to duplicate its efforts by separately assessing the same tax against individuals or entities who are not the actual taxpayers but are, by reasons of state law, liable for payment of the taxpayer's debt. The consequences of the assessment . . . attach to the tax debt without reference to the special circumstances of the secondarily liable parties.

*Id.* at 123.

But unlike in *Galletti* (where no statute created a requirement for separately assessing general partners), something in the Tax Code—§ 6901— does require the IRS to separately assess transferees. And shareholder transferees are not "secondarily liable" for a corporation's debt, unlike the *Galletti* general partners who were automatically liable for the partnership's debts under state law. The *Galletti* Court even noted it was using the phrase "secondary liability" to mean only "liability that is derived from the original or primary liability," *id.* at 122 n. 4, not any liability arising from the taxpayer's transfer of assets. *See also* LIABILITY, Black's Law Dictionary (10th ed. 2014) (defining secondary liability as "[l]iability that does not arise unless the primarily liable party fails to honor its obligation").

16

In the court's view, another Supreme Court case is much more on point. In *United States v. Continental Nat. Bank & Tr. Co.*, the IRS assessed the taxpayer and the initial transferee, but it had not assessed the subsequent transferees. 305 U.S. 398, 400 (1939). As discussed above, § 6901 extends a subsequent transferee's liability by one year from the expiration of the period of limitation for assessment against the preceding transferee, but not more than three years after the expiration of the period of limitation for assessment against the initial transferor. 26 U.S.C. § 6901(c). The IRS argued that the period to collect from the assessed initial transferee—a period dictated by a precursor to § 6502(a), the statute the government relies upon here—should also apply to the unassessed subsequent transferees. *Continental*, 305 U.S. at 403. But the Court explained that the time for bringing suit against an unassessed transferee was the number of years allowed for assessing the transferee—essentially reciting the rule from § 6501(a) that bars a suit to collect tax debts after the period for assessing those debts has passed. *Id.* The Court concluded that when the period of limitations for assessing transferees expires, a "suit in absence of assessment of transferee liability" is barred. *Id.* at 404–05. This court sees no reason why the Supreme Court's ruling regarding the liability of an unassessed

17

transferee of a transferee is any less applicable to an unassed initial transferee.

Finally, the court notes that the government fails to provide any analogous cases supporting its position than it may proceed against an unassessed transferee shareholder of a dissolved corporation—or any transferee who would not be ordinarily liable for the transferor's debt—after the time for bringing an assessment has passed. And the court, in its research, has also failed to find such a case. This is consistent with the court's interpretation of the Tax Code, its legislative history, and the Supreme Court's holding in *Continental* that a suit without an assessment of the transferee liability is barred once the time for making an assessment has passed.

## IV.   Conclusion

Based on the foregoing, the court finds that there is no mechanism within the Tax Code that would allow the government to proceed against the defendants to collect Henco's unpaid taxes once the time for assessing them has passed. And because the parties agree that the time for doing so as passed, the government's claim is barred. It is for these reasons that the defendants' motion to dismiss [Doc. No. 29] is GRANTED. The government may submit a proposed judgment against Henco pursuant to the court's

October 4, 2018 order granting the default judgment against Henco [Doc. No. 28].

**SO ORDERED** this 14th day of May, 2019.

/s/CHARLES A. PANNELL, JR.
CHARLES A. PANNELL, JR.
United States District Judge